UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~
BARBARA KOWALESKI,

                    Plaintiff,

         v.                          6:06-CV-796

HAZEL V. LEWIS, Superintendent, Hale Creek
A.S.A.C.T.C.; ROBERT FITCH, Deputy Superintendent
for Security; MICHAEL RORICK, Correction Officer;
HERMAN BRUNELLE, Sergeant; DAVID HERR,
Correction Officer; GEORGE MERTON, Lieutenant;
JEFFREY NICHOLLS, Correction Officer; FRANCIS
O'CONNOR, Sergeant; BELLE PERKINS; Correction
Officer; and STEVEN PUTMAN, Correction Officer,
Each Individually, and in their Official Capacity;

                    Defendants.
~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~

APPEARANCES:                    OF COUNSEL:

OLIVER & OLIVER               LEWIS B. OLIVER, JR., ESQ.
Attorneys for Plaintiff
156 Madison Avenue
Albany, New York 12202

HON. ANDREW M. CUOMO      DOUGLAS J. GOGLIA, ESQ.
Attorney General of the           BRIAN J. O'DONNELL, ESQ.
  State of New York
Attorney for Defendants
Department of Law
The Capitol
Albany, New York 12224

DAVID N. HURD
United States District Judge

## MEMORANDUM - DECISION and ORDER

## I. INTRODUCTION

      Barbara Kowaleski ("plaintiff" or "Kowaleski") brings suit pursuant to 42 U.S.C.

§ 1983, alleging violations of her First Amendment right to free speech, Fourteenth

Amendment rights to due process and equal protection, New York Civil Service Law

section 75-b, and New York Executive Law section 296.  The <u>ten</u> defendants are:

1. Hazel V. Lewis, Superintendent, Hale Creek  A.S.A.C.T.C. ("Supt. Lewis");
2. Robert Fitch, Deputy Superintendent for Security ("Dep. Fitch");
3. Michael Rorick, Correction Officer ("CO Rorick");
4. Herman Brunelle, Sergeant ("Sgt. Brunelle");
5. David Herr, Correction Officer ("CO Herr");
6. George Merton, Lieutenant ("Lt. Merton");
7. Jeffrey Nicholls, Correction Officer ("CO Nicholls");
8. Francis O'Connor, Sergeant ("Sgt. O'Connor");
9. Belle Perkins, Correction Officer ("CO Perkins"); and
10. Steven Putman, Correction Officer ("CO Putman")

(collectively "defendants").  All defendants are sued in their individual and official

capacities.  Plaintiff seeks compensatory and punitive damages, and injunctive relief.

Defendants move for summary judgment pursuant to Fed. R. Civ. P. 56.  Plaintiff

opposes.  The motion was considered on the submissions without oral argument.

## II. <u>FACTS</u>

As required under the summary judgment standard, the facts are set forth in a

light most favorable to the nonmovant plaintiff.  The following is a list of <u>nineteen</u>

nondefendants that are referred to in the facts:

1. CO Doyle
2. Sgt. Servello
3. CO Benz
4. Deputy Harding
5. Investigator Mark Miller ("Inv. Miller")
6. CO Levaille
7. Sgt. Seresky
8. CO Bott
9. Brenda Cameron
10. CO Rowe
11. Sgt. Watrobsk
12. CO Cristiano
13. Lt. Maxwell
14. Nurse MacFarland
15. CO Grant
16. CO West
17. Cook Clizbe
18. Counselor Devine
19. CO Davis

Barbara Kowaleski worked at Hale Creek Correctional Facility ("Hale Creek" or

"facility") within the New York State Department of Correctional Services ("DOCS") from

1995 to 2007.  She maintained a friendly work relationship with her coworkers and received positive evaluations for the time between 1995 and 2002.

While on duty on September 5, 2002, Kowaleski was assisting with inmate supervision in the mess hall.  Others present were nondefendants CO Doyle, Sgt. Servello, and defendant CO Rorick.  Defendant Sgt. O'Connor was the sergeant on duty, but was not present in the mess hall.  Plaintiff observed inmate  Baker take extra ketchup packets, in violation of Hale Creek regulations.  CO Rorick observed the inmate's  action and told him to put the extras back, which inmate Baker did.  When the inmates began leaving the mess hall, CO Rorick told inmate Baker to remain behind.  CO Rorick pushed inmate Baker face first to the wall, yelled at him, kicked his feet apart, and started searching him.  When inmate Baker came away from the wall before the search was complete, CO Rorick pushed him back.  Plaintiff approached CO Rorick and inmate Baker to prevent any unnecessary violence because assault against an inmate violated facility policies. CO Doyle also approached and placed inmate Baker in handcuffs.  CO Rorick taunted inmate Baker and pushed him into the wall at least one additional time with plaintiff nearby.  Sgt. O'Connor and nondefendant CO Benz entered the mess hall and approached the plaintiff, CO Rorick, and inmate Baker.  CO Benz escorted the inmate out of the mess hall.

Kowaleski later found defendant CO Rorick in the infirmary initiating disciplinary charges for assault against inmate Baker.  She expressed her opinion that CO Rorick had assaulted inmate Baker, rather than vice versa, and refused to sign the report because of the inaccuracy.  Plaintiff encountered defendant Sgt. O'Connor, and informed him that any assault during the mess hall incident had been committed by CO Rorick, not inmate

Baker.  Sgt. O'Connor commented that plaintiff seemed to be an "inmate lover" and

"violent."  (Pl.'s Dep., Ex. EE to Pl.'s Aff. in Opp'n, Doc. No. 34-32 at 30:10-18.)  Plaintiff

next went to the administrators at the prison.  She spoke with defendant Lt. Merton, who

had not been on duty when the mess hall incident occurred.  She expressed her concerns

that CO Rorick's report would be followed through, inmate Baker would receive additional

prison time for an assault he did not commit, and CO Rorick would go unpunished for

an actual assault on an inmate.  Lt. Merton told plaintiff to be very careful with her

accusations against employees because she could cause firings.

Within one or two days, plaintiff learned inmate Baker was being charged with

assault.  She went to nondefendant Deputy Harding and said she would testify on behalf

of inmate Baker at any hearings.  Deputy Harding ordered plaintiff to make a written report

of what she witnessed in the mess hall between inmate Baker and CO Rorick.  The

disciplinary charges against inmate Baker were soon dropped.

Employee discipline, such as initiated because of the mess hall incident, requires

the facility supervisors to send information regarding misconduct to the Bureau of Labor

Relations ("Labor Relations").  That office investigates further to determine whether a

Notice of Discipline is warranted.  Defendants CO Rorick, Sgt. O'Connor, and Lt. Merton

each received a Notice of Discipline for misconduct through this process.  CO Rorick pled

no contest.  Sgt. O'Connor said his Notice of Discipline was not followed through.  Lt.

Merton was exonerated regarding the Notice of Discipline and references to it were

expunged from his record.

In the days immediately following the mess hall incident with inmate Baker and CO

Rorick, nondefendant Investigator Mark Miller ("Inv. Miller"), from the Inspector General's

office, came to look into that incident.  At the time, Kowaleski was working at a different

facility for approximately two days while Inv. Miller examined the mess hall incident.  While

Inv. Miller worked at Hale Creek, nondefendant CO Levaille told Inv. Miller to shoot

plaintiff.  Defendant Hale Creek Supt. Lewis sent information to Labor Relations, which

disciplined CO Levaille for the statement made to Inv. Miller.

Inv. Miller finished his investigation of the mess hall incident and returned to his

home office.  Because the investigation was finished, Kowaleski's temporary assignment

outside Hale Creek ended and she returned to her usual assignment and responsibilities.

Soon after returning, plaintiff noticed markedly different treatment towards her from other

officers and superiors.

One day between September 5, and September 20, 2002, CO Rorick stood six

inches from Kowaleski in the presence of nondefendant Sgt. Seresky.  Plaintiff went to

Sgt. Seresky and explained that she felt harassed by the event, but does not know of any

steps were taken to discipline CO Rorick for his action, and she believes none were taken.

On September 20, 2002, Kowaleski left the administration building at Hale Creek.

CO Rorick followed her.  She returned to the building and stayed in the commander's

office for five minutes.  While in the office, she heard CO Rorick asking if anyone had

seen her, and finally saying he had found her when he went to the office door.  She talked

to a sergeant and wrote a memorandum to the Deputy Council in order to express her

objection to such treatment.  No supervisor addressed her memorandum or took any

action to discipline CO Rorick.

At that point, Kowaleski felt that she was being harassed and threatened, and her

ability to do her job suffered.  She attempted numerous times to contact Supt. Lewis, but

was always informed by her secretary that the superintend was not available and would call back.  Supt. Lewis never called back or contacted plaintiff in any way.

On October 2, 2002, Kowaleski went to the commander's office to speak with a sergeant.  Defendants CO Perkins and CO Putman purposely watched plaintiff from the control room.  After going to the office, she went to relieve nondefendant CO Bott.  He told her she needed to bring her own holster and ammunition pouch to the post because he had been using his own personal equipment.  Plaintiff went to the control room to get the equipment.  CO Perkins stuck up her middle finger at plaintiff.  CO Perkins and CO Putman both laughed.

On October 5, 2002, CO Rorick accused Kowaleski of following him and making faces at him.  She told a sergeant, Supt. Lewis, and Dep. Harding that CO Rorick's report and past behavior made her feel harassed, and it affected her and the entire facility.

On December 23, 2002, nondefendant CO Benz went to Kowaleski's post to relieve her.  To properly switch, the officers needed a key receipt to account for the keys at the time of the switch.  Plaintiff told CO Benz she did not have a receipt and asked him to bring one, expecting him to readily comply because the usual practice at the facility was for the second officer to bring the receipt.  CO Benz, however, refused to bring a receipt. His refusal forced plaintiff to leave her post while still accountable for the equipment.  She brought a receipt back to the post from an office, but had to leave CO Benz with the equipment. Plaintiff objected to that arrangement because she did not trust CO Benz to not tamper with the equipment which was under her responsibility. Plaintiff's distrust stemmed from a prior incident when she overheard CO Benz lying to another officer, saying that plaintiff had told an inmate how to sue the state.  After the switch, plaintiff

wrote a memorandum to her supervisors explaining the incident.  The memorandum was never addressed, despite plaintiff's belief that the incident disrupted the facility.

On January 7, 2003, Kowaleski entered the mess hall, causing CO Rorick to start yelling and asking for an escort to accompany him out of the room because he did not want to be harassed by plaintiff.  Plaintiff suggested to defendant Sgt. Brunelle that he escort CO Rorick out, mainly because she was disturbed to enter a room and hear CO Rorick yelling about her.  Plaintiff wrote a memorandum to defendant Dep. Fitch about the incident, considering it to be harassment and something that should be addressed by either Dep. Fitch or Supt. Lewis.  No one spoke to plaintiff about the memorandum or disciplined CO Rorick.

Defendant CO Putman routinely harassed Kowaleski.  He yelled when plaintiff went to the control room to pick up equipment and forced her to wait at the gate before allowing her to enter.  Defendant CO Rorick also routinely harassed plaintiff.  He would follow her through the building and accuse her of making false accusations.  Plaintiff wrote at least one memorandum to Dep. Fitch about the incidents, explaining that she felt the situation to be dangerous.  Dep. Fitch took no action and plaintiff continued to be given assignments near CO Rorick.

On May 22, 2003, Kowaleski was assigned to the control room to monitor phone calls.  Defendant CO Putman also had that assignment.  CO Rorick was assigned to the lobby, near the control room.  At one point, CO Putman told plaintiff that she had a call, but because plaintiff did not hear a phone ring, she assumed CO Putman was trying to trick her and she did not answer the phone.  CO Putman called her an "asshole."  CO Rorick stared at plaintiff through the control room window from the lobby.  Plaintiff asked

Dep. Fitch for permission to leave because CO Putman and CO Rorick were harassing her. Dep. Fitch said she needed to go to the infirmary and go home sick to be able to leave. Plaintiff went to the infirmary and encountered nondefendant Brenda Cameron, from personnel, who told plaintiff she could review minutes from a prior hearing on a then-unresolved matter between CO Perkins and the plaintiff. Plaintiff copied the minutes, believing she had permission from another agency to do so. She then left the building, as she was going home sick. Dep. Fitch went out to plaintiff and asked for the copy, which she returned to him. She followed Dep. Fitch back inside after he told her to do so. At Dep. Fitch's direction, she waited while he left the office. While plaintiff waited, defendants Sgt. Brunelle and CO Rorick began saying they needed to call their lawyers, in an attempt to disturb plaintiff. She put her badge on the desk in the office and said she was leaving. A lieutenant tried to stop her, but plaintiff ignored him. She wrote at least one memorandum to Dep. Fitch regarding all the incidents from the day, stating that she felt that all of the incidents were harassment. Plaintiff resumed trying to contact Supt. Lewis, but the superintendent never contacted her. Plaintiff believes Supt. Lewis purposely ignored her complaints of harassment.

On June 17, 2003, Kowaleski and CO Rorick were assigned to the mess hall. CO Rorick continuously stuck up his middle finger at plaintiff. Inmates and other officers observed CO Rorick at these times. Plaintiff wrote a memorandum to Dep. Fitch, expecting something to be done, because such harassment affected her and the facility.

On August 6, 2003, Kowaleski approached a dorm to relieve the officer at the post. She saw the person at the post was defendant CO Herr. She asked an inmate to walk to the post with her, explaining only that she did not want anything to happen. Plaintiff

expected the presence of a non-officer to deter CO Herr from engaging in any harass-ment.  CO Herr had harassed her on previous occasions by making crude remarks in front of inmates and during lineups.  She wrote a memorandum to Dep. Fitch regarding the past incidents with CO Herr and the August 6, incident when she felt it necessary to bring an inmate with her so she could safely relieve CO Herr.  Plaintiff's attempts to meet with Supt. Lewis to discuss the August 6, and other incidents were unsuccessful.

On August 29, 2003, Kowaleski attempted to leave Hale Creek in her vehicle when nondefendant CO Rowe cut her off.  CO Rowe then stopped to talk to CO Benz, who was entering Hale Creek in his vehicle.  After five minutes of being blocked by CO Benz and CO Rowe, plaintiff tried to drive around CO Rowe, but he accelerated and forced her off the road.  She wrote to Dep. Fitch, who did not inform Supt. Lewis about the memorandum, or effectively investigate the incident.  Plaintiff felt in physical danger after the incident on the road and from the lack of protection afforded her by her employer.

On October 31, 2003, Kowaleski left the package room and went to return inmate property receipt forms to the watch commander's officer, where defendant Lt. Merton was. He informed plaintiff that she needed to take them to a different office, but she replied that she couldn't because the office was closed and she usually gave the receipts to the watch commander when the other office was closed.  Lt. Merton took the receipts, stood up, began walking out of the office, and informed plaintiff that he considered her to have zero years of experience rather than twenty-three. Plaintiff believed Lt. Merton harassed her.

On November 23, 2003, Kowaleski tried to speak to defendant Sgt. O'Connor after a lineup because Sgt. O'Connor had made negative comments about nondefendant Sgt. Watrobski, and plaintiff believed Sgt. O'Connor made the comments solely because he

knew plaintiff and Sgt. Watrobski were friends.  Once she expressed her belief, Sgt. O'Connor told her: "If you don't like it go the fuck home, and don't work.  Go home sick again . . . I do not like your hair cut . . . bite me."  (Kowaleski Aff., Attach. 1, Doc. No. 34-2 at 28, ¶ 61.)

On November 26, 2003, CO Perkins was working in the lobby of the administration building.  When plaintiff entered the lobby, CO Perkins chanted "ugly" several times.

On November 30, 2003, Kowaleski needed to know the whereabouts of two inmates for her count.  She called the mess hall to verify that the two inmates were there. Defendant CO Putman answered the phone, listened to plaintiff inquire about the inmates, and hung up.  When plaintiff called the lieutenant with her count, she also mentioned the incident with CO Putman.  CO Putman later called plaintiff an "ugly ass piece of dog shit." (Id. at 29, ¶ 63.) She wrote a memorandum to supervisors over the incident, believing the harassment affected her ability to do her work, including to maintain an accurate count. The memorandum was ignored and plaintiff believes CO Putman was never disciplined.

On January 8, 2004, plaintiff left her lunch bag in the quiet room of a dorm while she went to the mess hall.  Defendant Sgt. Brunelle saw Kowaleski leaving the dorm for the mess hall and informed her that he was inspecting dorms, including the one with the quiet room containing her lunch.  She instructed the inmates to wait with the other officers while she went to the dorm. Plaintiff brought her lunch bag to the mess hall.  In response to Sgt. Brunelle's question, she explained her caution over the lunch bag.  In past times, she had been harassed, including finding toothpaste on the officer's phone in the dorm where she worked, and did not want her lunch tampered with.  That evening, plaintiff was relieved from her post by CO Cristiano.  Nondefendant Lt. Maxwell was also present and

instructed plaintiff to accompany him to the administration building.  Plaintiff was taken to the Watch Commander's office.  There, nondefendant Nurse MacFarland told plaintiff to place her lunch bag on the desk.  Lt. Maxwell searched the lunch bag.  Sgt. O'Connor searched plaintiff's coat.  He confiscated a floppy disk, without any apparent reason.  The disk belonged to nondefendant CO Grant, rather than property of DOCS, so the disk could not be seized as state property.  Plaintiff had the disk to assist her with writing memoranda, with CO Grant's full knowledge.  Lt. Maxwell and Sgt. O'Connor also had plaintiff open her locker for them to search.  Afterward, plaintiff went home because of the stress she experienced after the day's incidents.  She wrote a memorandum stating the search was unnecessary and unfounded.  Plaintiff later learned that she was the only corrections officer Supt. Lewis had ever ordered to be searched.

On January 9, 2004, Kowaleski confiscated fifty magazines as contraband. She took them to Dep. Fitch, who instructed her to return each one to where she found it and expressed his belief that her actions were unprofessional.

On March 5, 2004, while Kowaleski went to the Administration building, CO Putman exited his truck, looked at plaintiff, and called her an "asshole."

On March 14, 2004, Kowaleski entered the sergeant's office.  CO Rorick was in the office.  Plaintiff asked him to move several times so she could reach her lunch.  CO Rorick did not move but started yelling at plaintiff.  He then left and returned with defendant Lt. Merton, saying he wanted to speak with the sergeant without plaintiff being present. Nondefendant Sgt. Watrobski asked plaintiff to go to the lineup room.  While there, CO Rorick went up to plaintiff, stood close to her, yelled in her face, and said she was harassing him.  He stopped after being asked by Sgt. Watrobski and Lt. Merton, but he did

not receive any other discipline.  Plaintiff wrote a memorandum to Dep. Fitch, seeking action, but he ignored the memorandum.

On March 17, 2004, defendant CO Rowe went to the control room window where plaintiff was working.  He whistled at the window as if calling a dog.  CO Rowe signed out the gas pump key and gas log book.  When he returned the key, he threw it through the slot in the window and the key landed on the floor.  He later threw two other keys through the slot.  Kowaleski's related memorandum was ignored by all supervisors.

On March 18, 2004, defendants Sgt. Brunelle and Lt. Merton conducted Kowaleski's performance evaluation.  On March 24, 2004, plaintiff wrote a memorandum voicing concerns about Sgt. Brunelle's and Lt. Merton's ability to fairly evaluate her.  She explained that Sgt. Brunelle harassed and constantly discriminated against her, and that his behavior had influenced other officers to act similarly toward her.  She also felt that Sgt. Brunelle could not adequately judge her work because he had not been her direct supervisor for the time period being evaluated; and that he had not even been working for a period of five months during the time frame of plaintiff's evaluation.  Plaintiff also suggested that Lt. Merton harassed her as retaliation for her having caused Lt. Merton to be brought up on charges.  Part of the retaliation included approving other officers' harassment of her.  She finally requested other staff members to reevaluate her.  Her request was denied.

On March 27, 2004, a visitor told Kowaleski an inmate wanted to send a package with the visitor.  The visitor had a receipt showing the inmate left a package in the package room.  Plaintiff went to the package room and looked for the inmate's package but could not find it there or in the lobby with the returns.  When plaintiff spoke by phone with CO

Benz (the officer working in the package room), he merely told her the package was not there and hung up.  Plaintiff wrote a  memorandum to Dep. Fitch, which he did not address.

On April 9, 2004, Kowaleski learned nondefendant CO West had read her memorandum of March 27, 2004, to Dep. Fitch.  CO West told plaintiff he had seen it from CO Benz.  Plaintiff started looking for the sergeant after speaking with CO West, because she felt unhappy that the memorandum had been circulated beyond defendants Dep. Fitch and Supt. Lewis.  While she was looking for the sergeant in an office, plaintiff encountered nondefendant Cook Clizbe who was reading the March 27, 2004, memorandum.  Clizbe confirmed that it was that memorandum.  They both exited the office and Clizbe gave the memorandum to CO Benz.  Plaintiff called Lt. Maxwell and told him her memorandum was being passed between employees.  Lt. Maxwell admitted he gave the memorandum to CO Benz so he could respond to it, but Lt. Maxwell stated he did not give CO Benz permission to circulate the memorandum.  Later in the shift, Sgt. O'Connor told plaintiff that the officers, including Clizbe, denied seeing the memorandum. Sgt. O'Connor then told plaintiff that she was a bad worker and should have been terminated years earlier.  Plaintiff wrote a memorandum to Dep. Fitch.  He did not address her concerns or take any other action to remedy the situation.

On April 12, 2004, Kowaleski attempted to enter Hale Creek from the outside.  The officers in the control room locked her out, even after she rang the bell to be admitted. The officers' behavior delayed plaintiff's return to the facility.  She immediately spoke with her supervisors regarding the incident, and then wrote a memorandum to Dep, Fitch.

While he did reply to the memorandum, Dep Fitch only inquired of the officers if they had intentionally delayed plaintiff's entrance.

On April 16, 2004, Kowaleski received a response from Supt. Lewis concerning her memorandum of March 24, 2004, in which she requested to be reevaluated by someone other than Sgt. Brunelle.  Supt. Lewis' memorandum changed plaintiff's evaluation to good but did not allow a reevaluation.  Supt. Lewis did not address any of plaintiff's claims of harassment.

On September 29, 2004, Kowaleski relieved defendant CO Herr to permit him to make a phone call. Plaintiff learned a shooting had occurred at the school where CO Herr's son attended, and CO Herr had gone to make sure his son had not been injured. When nondefendant Counselor Devine, asked plaintiff where CO Herr had gone, plaintiff replied that he needed to make a call because of a shooting at his son's school.  The only inmate present in the room was in a separate cubicle, eight feet away.  Plaintiff told the counselor what had happened because the counselor and CO Herr were friends.

On October 4, 2004, Kowaleski entered the facility and CO Perkins told her to empty her bag.  Plaintiff complied, since such searches were permitted by the rules at the facility.  While CO Perkins searched plaintiff's bag, nondefendant CO Davis entered.  CO Perkins did not ask to search CO Davis' things.  Plaintiff reminded CO Davis to have his belongings searched, which upset CO Perkins, causing her to start yelling.  CO Perkins then left her post and went to Sgt. O'Connor, leaving the facility entrance unguarded.  In Sgt. O'Connor's office, CO Perkins and plaintiff discussed what had happened.  Sgt. O'Connor told them he did not want to be involved, but did not order plaintiff to be quiet.

Kowaleski received a Notice of Discipline for the May 22, 2003, incident,[1] and the August 6, 2003, incident.[2]  Eventually, plaintiff and the DOCS entered arbitration to resolve both Notices of Discipline.  An employee is not required to accept the suggested disciplinary action in the Notice of Discipline, but rather can submit the entire issue to an arbitrator for a finding of guilt or innocence regarding the charges and what discipline is appropriate.  On August 21, 2006, the arbitrator found plaintiff guilty of three charges pertaining to the May 22, incident - an inappropriate attempt to copy and remove documents from Hale Creek; failure to obey an order to wait for Dep. Fitch to return when she entered the lieutenant's office; and failure to obey an order not to leave.  She was also found guilty of the only charge pertaining to the August 6, incident - inappropriate use of an inmate as a witness and personal protector.  However, the arbitrator found the punishment (termination) suggested by Labor Relations inappropriate and instead ordered suspension without pay for sixty days.

Kowaleski also received a later Notice of Discipline, for which she and the DOCS entered arbitration.  This Notice of Discipline consisted of three charges against plaintiff: first - inappropriate discussion of defendant CO Herr's personal situation in the presence of an inmate; second - an inappropriate verbal exchange with CO Perkins; and third - disrespect and insubordination to Sgt. O'Connor.  The arbitrator dismissed the charge alleging an inappropriate verbal exchange, but plaintiff was found guilty with regard to the first and third charges.  Plaintiff disputes the arbitrator's findings.  While the arbitration

---

[1]  May 22, 2003, was the date plaintiff copied the hearing minutes, returned them to Dep. Fitch, and left before receiving permission to do so.

[2]  August 6, 2003, was the date plaintiff took an inmate to accompany her when she went to relieve CO Herr.

opinion concludes that Sgt. O'Connor ordered plaintiff to stop talking, she strenuously maintains he said nothing as an order, and therefore she should not be guilty of disrespect and/or insubordination.  Nevertheless, the arbitration decision was final and the arbitrator held that termination was the appropriate punishment.  Kowaleski's employment with DOCS ended January 25, 2007.  The arbitration decision was upheld in New York State court.

## III.  **SUMMARY JUDGMENT STANDARD**

Summary judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law.  Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986).  The moving party carries the initial burden of demonstrating an absence of a genuine issue of material fact.  FED. R. CIV. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552 (1986).  Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986).

When the moving party has met the burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., 475 U.S. at 586, 106 S. Ct. at 1356.  At that point, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56; Liberty Lobby, Inc., 477 U.S. at 250, 106 S. Ct. at 2511; Matsushita Elec. Indus. Co., 475 U.S. at 587, 106 S. Ct. at 1356.  To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury

could return a verdict for the nonmovant.  Liberty Lobby, Inc., 477 U.S. at 248-49, 106 S.

Ct. at 2510; Matsushita Elec. Indus. Co., 475 U.S. at 587, 106 S. Ct. at 1356.

## IV.  DISCUSSION

Defendants present several arguments in support of their motion for summary

judgment.  First, defendants contend that all claims are barred by res judicata.  Second,

defendants argue plaintiff's First Amendment rights were not violated because the

amendment does not protect speech made as part of employment responsibilities.  Third,

they argue no substantive due process violations occurred because plaintiff had no right to

governmental protection.  Fourth, defendants contend that plaintiff did not suffer a

violation of equal protection because she did not belong to a protected class.  Finally,

defendants argue that qualified immunity protects them from all of plaintiff's claims.

### A.  Res Judicata

Defendants contend that because plaintiff and the DOCS completed arbitration

regarding plaintiff's Notices of Discipline and the outcome underwent review in state court,

she is barred from relitigating the issue in any court.

Res judicata may only be applied, *inter alia*, when the parties received a

 full and fair opportunity to litigate the issue in the prior forum.  Bottini v. Sadore Mgmt.

Corp., 764 F.2d 116, 119 (2d Cir. 1985).  Similarly, the forum in the first action must have

been willing and able to hear the theory advanced in the second action.  Id.  The

arbitration decisions in the instant case meet neither requirement.  A full and fair

opportunity to litigate would require the arbitrator to consider a retaliation defense after

plaintiff made it known she wished to use that defense.  However, the arbitrator

determined he did not have jurisdiction to hear the defense and consequently refused to

hear plaintiff's retaliation case.  The arbitrator's choice deprived Kowaleski of a full opportunity to litigate the issue and demonstrated inability and unwillingness to hear the theory plaintiff advances in the second forum.  None of the parties contest the applicability of the retaliation defense absent from the arbitrator's decision.  Therefore, res judicata does not bar plaintiff from asserting her claim in federal court because she previously did not receive a full and fair opportunity to litigate all issues in her claim.

### B.  First Amendment Retaliation

Kowaleski contends that her report and dealings against defendant CO Rorick qualify as protected speech under the First Amendment and she is therefore protected from any retaliation stemming from the exercise of her right.  Defendants argue that neither plaintiff's dealings nor her reports qualify as protected speech because plaintiff, as a public employee, has less First Amendment protection than other citizens.

Government employees need to demonstrate three elements to establish a First Amendment violation: (1) the employee's speech was constitutionally protected; (2) the employee experienced an adverse employment decision; and (3) a causal connection existed between the employee's speech and the adverse employment action.  Hale v. Mann, 219 F.3d 61, 70 (2d Cir. 2000).  A government employee's speech will be constitutionally protected when: (1) the employee spoke as a citizen on a matter of public concern; and (2) when the government lacked sufficient reason for treating the employee different from any member of the general public.  Garcetti v. Ceballos, 547 U.S. 410, 418, 126 S. Ct. 1951, 1958 (2006).

The parties dispute whether Kowaleski's speech was constitutionally protected, and specifically whether she spoke as a citizen on a matter of public concern.  Plaintiff

recognized part of a correction officer's duty includes reporting misconduct and treating inmates humanely.  Defendants point to plaintiff's admission of the responsibility to report officer misconduct as evidence she spoke only as part of her job, not as a citizen; and thus cannot be protected under the First Amendment.  Plaintiff contends that because she volunteered to testify on behalf of the inmate at any hearings concerning either the inmate or CO Rorick, she went beyond her job responsibilities, and that speech beyond one's work responsibilities constitutes protected speech by a citizen.  Defendants dispute plaintiff's point, arguing that because inmates can subpoena witnesses for hearings, her offer is meaningless because she could be forced to do what she volunteered. Possibly more persuasive is that volunteering to testify on behalf of the inmate is not very different from reporting officer misconduct.  Testimony could plausibly be expected after reporting misconduct.  Also pertinent is that Hale Creek never conducted any hearings regarding inmate Baker, so the need for plaintiff's testimony, either by subpoena or choice, never arose. All plaintiff actually did was to make the report of misconduct by CO Rorick, and all parties agree officers have that duty and that plaintiff received an order from Dep. Harding to make the written report.

Because Kowaleski fails to show she spoke as a citizen rather than an employee, it is immaterial whether she spoke on a matter of public concern.  Speech made only as a government employee requires dismissal of her First Amendment claim.

### C.  Due Process

In two instances, a state may have a responsibility to protect a victim of private violence, as a function of due process.  The two instances are:  (1) if the state had a special relationship with the victim; or (2) if the state's agents were involved in creating or

increasing the danger to the victim.  Matican v. City of New York, 524 F.3d 151, 155 (2d

Cir. 2008).  If one of the two instances applies, the behavior by the state then must shock

the conscience to constitute a due process violation.  Id.  No parties argue that plaintiff

and DOCS had a special relationship - leaving only whether the state increased or created

danger to plaintiff at issue.

### 1.  Danger Increased or Created by the State

In due process claims, state actions must be differentiated between active and

passive.  To hold the state liable, the state must have committed active behavior. Pena v.

DePrisco, 432 F.3d 98, 110 (2d Cir. 2005).  The Pena court held "to the extent that fellow

police officers and some supervisors participated in or condoned . . . behavior . . . it could

be inferred by a reasonable juror that those defendants, by their actions, implicitly but

affirmatively condoned . . . behavior and indicated . . . [there] would not be disciplin[e] for

. . . conduct."  Id.

Kowaleski presents a nearly identical situation to Pena.  After she made the report

against CO Rorick, defendant Sgt. O'Connor called her an "inmate lover" and "violent."  As

a sergeant, he could implicitly communicate to officers that certain behavior toward

plaintiff would be tolerated.  Furthermore, those comments show he participated in

negative behavior toward plaintiff.  Numerous memoranda to defendants Dep. Fitch and

Supt. Lewis, and to sergeants on duty went ignored.  In the light most favorable to plaintiff,

there was a substantial pattern of supervisors ignoring plaintiff's reports of harassment

toward herself and misconduct by other officers, and on some occasions, by sergeants.

This situation presents the same possibility as in Pena for a reasonable juror to conclude

that there was acceptance of the behavior plaintiff objects to, and assurance that

discipline would not be taken.  Consequently, this possibility is sufficient to demonstrate that the state created or increased the danger plaintiff was subjected to.

### 2.  **Behavior that Shocks the Conscience**

Defendants also contend that even if the state created or increased the danger to plaintiff, the state's behavior still fails to shock the conscience.  Behavior must be egregious and outrageous to shock the conscience.  Id. at 112.  The Pena court referred to "behavior . . . that presented obvious risk of severe consequences and extreme danger" as conscience shocking.  Id. at 114.  Negligently inflicted harm does not shock the conscience.  County of Sacramento v. Lewis, 523 U.S. 833, 849, 118 S. Ct. 1708, 1718 (1998).  Deliberate indifference may suffice to shock the conscience.  Id. at 851, 118 S. Ct. at 1719.  In addition, deliberate indifference implies deliberation over the actions.  Id., 118 S. Ct. at 1719.

In this case, the behavior of several officers suffices to shock the conscience.  The events do suggest deliberate indifference, as the officers' behavior was carried over several years, regardless of plaintiff's attempts to end the harassment.  None of the officers' actions can be construed as occurring negligently, as their actions required thought and intent.

Defendant CO Perkins, in addition to antagonistic staring, gesturing, and speaking, singled out Kowaleski to be searched when she entered the facility.  Plaintiff knew the search to be permitted under facility rules, and believed CO Perkins began the search as part of a requirement to search all employees entering Hale Creek.  When CO Davis entered the lobby, plaintiff spoke to him, not CO Perkins, to remind him to be searched.  Upon hearing plaintiff, CO Perkins vigorously objected to what she considered to be

plaintiff telling her how to do her job, and left the lobby unattended to complain to defendant Sgt. O'Connor.  CO Perkins created a risk of extreme danger by leaving the lobby in a prison unattended.  An officer searching belongings helps to keep inmates, officers, and visitors safe.  CO Perkins' departure from her post, especially for something as minor as what occurred, created danger, and therefore suffices to shock the conscience.

Defendant CO Putman acted similarly as Defendant CO Perkins.  In addition to antagonizing plaintiff by name-calling and staring, he committed at least one act towards plaintiff that presented danger.  Kowaleski called CO Putman so she could verify that two inmates in her count were at CO Putman's location.  CO Putman refused to provide her with the verification she needed.  When CO Putman hung up the phone instead of verifying the inmates' presence, he created a dangerous situation.  Officers need an accurate count of inmates to ensure all inmates are where they should be.  If inmates are unaccounted for, there is a danger they have escaped or are harming others.  CO Putman's refusal to assist plaintiff in her count presented this risk and demonstrated his deliberate indifference to the risk and consequences of an inaccurate count, sufficing to shock the conscience.

Numerous instances demonstrate defendant CO Rorick's extreme and egregious behavior.  Plaintiff's affidavit and deposition present numerous incidents that CO Rorick instigated.  The volume of incidents points to CO Rorick's deliberate indifference to any harm and danger he might cause.  At one point, CO Rorick began yelling and insisted a supervisor escort him out of the mess hall when Kowaleski entered.  Defendant Sgt. Brunelle did eventually take CO Rorick out of the mess hall.  This created danger in two

ways:  (1)  it left the officers supervising the inmates short two workers, a risky situation should the officers need to exert control over inmates; and (2) the inmates became aware CO Rorick had some personal issue with the plaintiff.  Facility guidelines dictate that such information be kept away from inmates because they can use it against officers.  CO Rorick continuously gave plaintiff the middle finger across the mess hall while inmates were eating, thus exposing a personal issue between himself and the plaintiff.  Therefore, risking safety in a prison suffices to shock the conscience.

Mid-level supervisors also committed behavior sufficient to shock the conscience. For instance, one of defendant Lt. Merton's earliest actions after the mess hall incident was to inform plaintiff she should be careful when making accusations about inmate assault.  Lt. Merton might be deliberately indifferent to the possibility that prison officers assault inmates, despite the fact that any assault against an inmate violates Hale Creek regulations.  His comments show greater concern for preserving the status quo than ensuring fair treatment.  It would clearly be dangerous for inmates' safety if a lieutenant was to suppress information about assaults against inmates.

At least once, defendant Sgt. O'Connor, like defendant Lt. Merton, ignored the possibility of an assault on an inmate.  Kowaleski clearly advised Sgt. O'Connor what she saw occur in the mess hall between inmate Baker and CO Rorick; and yet all Sgt. O'Connor saw fit to do was call plaintiff an "inmate lover" and "violent."  He increased the danger to inmates.  His other dealings with plaintiff, such as negative comments and insults, carry more weight than those of a co-officer and suggest to officers that what in other circumstances would be misconduct was actually acceptable behavior.

The highest level officials at Hale Creek also acted in ways that risked danger. From the mess hall incident in 2002 through Kowaleski's termination in 2007, defendants Supt. Lewis and Dep. Fitch routinely and purposely ignored plaintiff's memoranda reporting misconduct - some of which was very serious.  Although not named as a defendant, CO Rowe maneuvered his vehicle to force Kowaleski to steer her car off the road.  She reported this incident to Dep. Fitch, because it caused her to fear physical danger.  Dep. Fitch did not forward plaintiff's memorandum about the incident to Supt. Lewis.  Instead, Dep. Fitch ignored the memorandum.  CO Rowe created serious danger by forcing plaintiff off the road.  Dep. Fitch took no action to prevent similar actions or to punish the first act.  Dep. Fitch left plaintiff in physical danger, and that choice can plausibly be characterized as egregious and conscience-shocking behavior.

Defendant Supt. Lewis' actions present a somewhat different situation.  Every attempt Kowaleski made to meet with Supt. Lewis failed.  Supt. Lewis did not speak with plaintiff once, despite all the times plaintiff talked to Supt. Lewis' secretary about her situation.  Additionally, Supt. Lewis either ignored memoranda sent by plaintiff, or took only minimal steps.  In one case, CO Levaille told Inv. Miller he should shoot plaintiff. Although Supt. Lewis sent the information about the comment to Labor Relations, plaintiff felt threatened and believed more serious action needed to be taken.  In the entirety, Supt. Lewis' characterization of plaintiff's memoranda as childish, and her decision to ignore the memoranda created a serious risk of danger for plaintiff.  After receiving no assistance from her superior officers, she took her concerns to the person with the most authority, and yet Supt. Lewis still chose to take no action to assist plaintiff, leaving her completely unable to stop any harassment.

Defendants CO Herr, CO Nicholls, and Sgt. Brunelle will be dismissed from the due process claim because the record does not demonstrate conscience shocking behavior on their part.  CO Herr's primary actions consisted of crude remarks.  He had no direct involvement in the incident when Kowaleski spoke to the counselor about the shooting at CO Herr's son's school.  He also complied with Hale Creek's rules when plaintiff took the inmate to accompany her to complete the switch.  Plaintiff only referred to past remarks by CO Herr when explaining her rationale for taking the inmate to the switch.

Sgt. Brunelle made antagonistic comments concerning plaintiff, but his other actions do not constitute risking the danger needed to shock the conscience.  Kowaleski does not contest Sgt. Brunelle's right to search the dorm she worked in.  He wrote a poor performance evaluation for plaintiff, but Supt. Lewis changed the evaluation to good, so there is little chance of harm to plaintiff.

CO Nicholls' presence in the record is quite minor.  Plaintiff presents only two incidents involving him, and neither rises to the level of egregiousness.  In one instance, he hung up the phone, but unlike when defendant CO Putman did so, it does not seem to have been over something as important as an inmate count.  He also mischaracterized a statement by plaintiff, but she presents no effects from it, so it appears implausible his actions shock the conscience.

Therefore, defendants' motion for summary judgment will be denied as to COs Rorick, Perkins, Putman, Sgt. O'Connor, Lt. Merton, Dep. Fitch, and Supt. Lewis; and granted as to CO Nicholls, CO Herr, and Sgt. Brunelle as the complaint concerns plaintiff's due process claim.

### D. **Equal Protection**

Kowaleski presents her equal protection claim in the context of public employment. She does not claim a class of one violation, as public employees are barred from bringing such claims.  Engquist v. Oregon Dep't of Agric., ___ U.S. __, __, 128 S. Ct. 2146, 2148-49 (2008).   Rather, plaintiff makes a class-based equal protection claim.

Equal protection claims can only be brought against a state or state actors. Rendell-Baker v. Kohn, 457 U.S. 830, 847, 102 S. Ct. 2764, 2769 (1982).  Private individuals qualify as state actors when they "are endowed by the State with powers or functions governmental in nature."  Evans v. Newton, 382 U.S. 296, 299, 86 S. Ct. 486, 488 (1966).  Also, state action is present when there is "such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may fairly be treated as that of the State itself.'"  Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295, 121 S. Ct. 924, 930 (2001) (quoting Jackson v. Metro. Edison Co., 419 U.S. 345, 351, 95 S. Ct. 449, 453 (1974)).

All defendants named in Kowaleski's suit meet the state action requirement because her superiors are indisputably endowed with governmental powers under Evans. Moreover, they are employed by New York State and carry out the state's regulations for operating a prison, and the regulations cover both prisoners and officers.  The defendants equal in rank to plaintiff also constitute state actors.  The operation of a prison necessitates distribution of governmental powers to all of the prison's employees, a sufficient condition for liability under Evans.  Additionally, the officers' situation presents the nexus required in Brentwood Acad. because all incidents occurred at the facility and involved officers on duty.  Because the incidents at issue occurred from 2002 to 2007, the

officers must have eventually noted that not a single incident resulted in significant punishment, a realization that suggests the state's assent.  Receiving permission to antagonize another officer while on duty suggests a very close nexus between individuals and the state, sufficing to constitute state action.

When an equal protection class-based claim does not implicate a suspect class, the challenged action must be rationally related to a government purpose.  Soberal-Perez v. Heckler, 717 F.2d 36, 41 (2d Cir. 1983).  Kowaleski claims officers who tell the truth (about officer misconduct) are treated differently than other officers.  This classification is not a suspect class.  Massachusetts Bd. of Retirement v. Murgia, 427 U.S. 307, 313 n.4, 96 S. Ct. 2562, 2566 n.4 (1976) (citing cases that characterize race, alienage, and ancestry as suspect classes).  Rational basis classifications must be "based upon some reasonable ground - some difference which bears a just and proper relation to the attempted classification - and is not a mere arbitrary selection."  Gulf, Colorado, and Santa Fe Ry.v. Ellis, 165 U.S. 150,165-66, 17 S. Ct. 255, 261 (1897).

Kowaleski claims there is no rational basis for treating officers who tell the truth different from officers who remain silent.  Importantly, she alleges more harm suffered than only the harm created by the penalties imposed by the arbitrators.  She maintains she suffered harm from all the incidents of harassment, and in the light most favorable to her, these claims are true.  Defendants overlook these claims and instead insist the only different treatment included the Notices of Discipline.  No rationale whatsoever is presented for treating her differently when the treatment at issue includes insults, threats, lock-outs, and persistent disregard for plaintiff's reports of harassment.  In fact, it seems most unlikely that defendants would be able to find a legitimate reason to permit

harassment against officers who tell the truth, but not against officers who remain silent. Therefore, because defendants fail to present a rational basis for treating plaintiff differently in all aspects she alleges, the motion for summary judgment as to plaintiff's equal protection claim will be denied.

### E.  Qualified Immunity

Government officials are entitled to qualified immunity when "they can establish that it was objectively reasonable for them to believe their actions were lawful at the time." Demoret v. Zegarelli, 451 F.3d 140, 148-49 (2d Cir. 2006).  However, if the officials knew or should have known that the actions they took violated clearly established constitutional rights, the officials are subject to liability.  Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982).  Violations of clearly established constitutional law can be determined by considering the "objective legal reasonableness" of the acts.  Pearson v. Callahan, 555 U.S. __, __, 129 S. Ct. 808, 822 (2009).

Here, plaintiff claims violations of her due process and equal protection rights, which indisputably are constitutional rights.  See U.S. CONST. amend. XIV.  No defendant presents sufficient objective legal reasonableness to justify their actions and show the constitutional rights were not clearly established.  As for due process, it plausibly is not objectively legally reasonable for state actors to create or increase the danger to an employee.  As for equal protection, it is not objectively legally reasonable for state actors to treat people differently without a rational reason to do so.

There are. of course, many questions of fact to be decided by a jury since the defendants have denied almost all of the material allegations of the plaintiff.  However, in viewing the facts most favorable to the plaintiff, the defendants are not entitled to qualified

immunity as a matter of law.  The jury, after hearing the evidence, may decide the law and facts entitle some, or all of the defendants to qualified immunity.  On the other hand, the jury may decide, based on the law and facts, that some, or all of the defendants violated the clearly established constitutional rights of the plaintiff; that their actions were not objectively reasonable, and deny qualified immunity.

### F.  New York State Law Claims

Defendants only argue for dismissal of plaintiff's state law claims on the grounds of res judicata.  Because res judicata has been found inapplicable, and defendants presented no other reasons for dismissal of plaintiff's state law claims, defendants' motion for summary judgment as to the state law claims will be denied.

## V.  CONCLUSION

Kowaleski must have received a full and fair opportunity to litigate her claims before she can be barred by res judicata.  Because the arbitration did not consider her retaliation defense, she did not receive a full and fair opportunity to litigate.  Plaintiff did not speak as a citizen when she reported defendant CO Rorick's actions.  Plaintiff did establish state-created danger and behavior that shocks the conscience as to defendants Supt. Lewis, Dep. Fitch, Lt. Merton, CO Rorick, Sgt. O'Connor, CO Perkins, and CO Putman. However, plaintiff failed to establish such behavior by defendants Sgt. Brunelle, CO Nicholls, and CO Herr.  Plaintiff did establish a possibility of class-based different treatment without a rational basis for such treatment.  Plaintiff adduced sufficient factual evidence of violations of clearly established constitutional rights to avoid qualified immunity to the defendants as a matter of law.  Supplemental jurisdiction over plaintiff's state law claims will continue to be exercised.

Accordingly, it is

ORDERED that

1. Defendants' motion for summary judgment as to the First Amendment claim is GRANTED, and that cause of action is DISMISSED;

2. Defendants' motion for summary judgment as to the due process claim is GRANTED in part and DENIED in part;

      a. Defendants Sgt. Brunelle, CO Herr, and CO Nicholls are DISMISSED; and
      b. The motion is otherwise DENIED;

3. Defendants' motion for summary judgment as to the equal protection claim is DENIED;

4. Defendants' motion for summary judgment based upon qualified immunity as a matter of law is DENIED; and

5. Defendants' motion for summary judgment as to the state law claims is DENIED.

IT IS SO ORDERED.


Dated:   August 13 , 2009
        Utica, New York.

_____
United States District Judge